P. Terry Anderlini (SBN 44783)
Joseph M. Goethals (SBN 242889)
Jackson D. Morgus (SBN 318453)
ANDERLINI & McSWEENEY LLP
66 Bovet Road, Suite 285
San Mateo CA 94402
Telephone: 650.212.0001
Fax: 650.212.0081
jmorgus@amlawoffice.com
tanderlini@amlawoffice.com

*Attorneys for Plaintiff and
the Proposed Class*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Christopher Mosson**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**BANK OF AMERICA, N.A.**, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT;<br><br>1. VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW<br><br>2. VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT<br><br>3. VIOLATIONS OF THE ELECTRIC FUNDS TRANSFER ACT<br><br>4. NEGLIGENCE<br><br>5. BREACH OF CONTRACT<br><br>DEMAND FOR JURY TRIAL |

1.    Plaintiff Christopher Mosson ("Mosson" or "Plaintiff"), on behalf of himself and all others similarly situated, alleges the following facts and claims against Defendant Bank of America, N.A. ("Bank of America" or "Defendant"), relating to the company's administration of California unemployment insurance and other benefits.

2.    Bank of America, has an exclusive contract to administer unemployment benefits in California.

3.    In administering these benefits, Bank of America has been either unwilling or unable to stop criminals from breaching Bank of America's systems and controls prevent the theft of EDD benefits from EDD benefits recipients with a Bank of America EDD prepaid debit card (an "EDD cardholder").

4.    Even worse, Bank of America's customer service and fraud investigation departments have been entirely unhelpful in resolving instances of fraud.

5.    Despite Bank of America's "Zero Liability" policy for fraudulent transaction, Bank of America has failed to assist or even communicate with many of the countless defrauded EDD cardholders.  Bank of America is solely responsible for the administration of EDD benefits, and the EDD has no ability to intervene in the company's procedures.

6.    Bank of America failed to act in accordance with industry security standards which require securing the private financial information of EDD cardholders and accounts, and by issuing EDD cards with "EMV chips,"[1] rather than issuing cards with only outdated and vulnerable "magnetic stripe" technology.

7.    Through its actions, Bank of America has violated California's Unfair Competition Law, the California Consumer Privacy Act, and Regulation E of the federal Electronic Funds Transfer Act; has breached its contract with EDD cardholders; and has negligently harmed EDD cardholders.

---

[1] "EMV" stands for Europay, Mastercard, and Visa, after the companies that created the technology.

- 1 -

## I.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to each of the following: (a) 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Class members as defined below, and minimal diversity exists because the majority of putative Class members are citizens of a state different than that of Bank of America; (b) 28 U.S.C. § 1332(a) because Plaintiff and Class members are citizens of California, Bank of America is incorporated under the laws of Delaware and has its principal place of business in North Carolina, and the amount in controversy exceeds $75,000 exclusive of interests and costs; and (c) 28 U.S.C. § 1331 with respect to the cause of action arising under federal Electronic Funds Transfer Act (15 U.S.C. § 1693, *et seq.*), and 28 U.S.C. § 1367 with respect to the causes of action arising under state law.

9.    This Court has specific personal jurisdiction over Bank of America because Bank of America has sufficient minimum contacts with California, has purposely availed itself of the benefits and protection of California law, and does a substantial amount of business in and with the State of California (including contracting with the State of California to provide services to California citizens), such that the Court's exercise of personal jurisdiction accords with due process.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the acts or omissions giving rise to the claims in this Complaint occurred in this District, and because Defendant is subject to the Court's personal jurisdiction with respect to this action.

## II.    PARTIES

### A.    Plaintiff

11.    Plaintiff Christopher Mosson was a victim of Bank of America's failure to protect their client's EDD Benefits and failure to provide proper resolution to provide support.

12.    Mosson resides in Oakland, California. He is a sound, lights and video professional, providing support and assistance to venues hosting large events such as trade shows, concerts or conventions. This industry has been decimated by the COVID-19 pandemic making large gatherings unsafe and unlawful. As a result, Mosson has been unable to work and has been since last spring.

1    Mosson applied for and received EDD unemployment benefits in May, 2020. He received a Bank
2    of America EDD Visa debit card with a magnetic strip but not an EMV chip, in order to access his
3    benefits. In early December, 2020, Mosson noticed a number of fraudulent transactions on his
4    account. He reported these fraudulent charges to Bank of America only to be locked out of his
5    account, become unable to access his funds, and eventually was told that while he was locked out
6    of his account, his funds had been returned to the State of California. Despite its "Zero Liability"
7    policy, Mosson's repeated phone calls requesting help regaining access, and visits to Bank of
8    America branches, Bank of America has been either unable or unwilling to restore his access to his
9    account and benefits.

10          **B.      Defendant**

11          13.     Defendant Bank of America, N.A., is one of the largest banking associations in the
12   United States. It is incorporated in the state of Delaware and, as set forth below, does significant
13   business in California through, among other things, its exclusive contract with the State of California
14   to administer EDD benefits.

15          **C.      Doe Defendants**

16          14.     The true names and capacities of Defendants DOES 1–20, inclusive, are currently
17   unknown to Plaintiff. Accordingly, Plaintiff sues each and every DOE Defendant by such fictitious
18   names. Each DOE Defendant, individually and collectively, is responsible in some manner for the
19   unlawful acts alleged herein. Plaintiff will seek leave of this Court to amend this Complaint to
20   reflect the true names and capacities of the DOE Defendants when their identities become known.

21          **D.      Aiding and Abetting, Concert of Action**

22          15.     Plaintiff alleges that at all times relevant to the events giving rise to this action, each
23   and every Defendant was acting as an agent or employee of each of the other Defendants. Plaintiff
24   further alleges that at all times relevant to those events, each and every Defendant was acting within
25   the course and scope of that agency or employment at the direction of or with the full knowledge,
26   permission, or consent of each and every other Defendant. In addition, each of the acts or omissions
27   of each and every Defendant was made known to, and ratified by, each of the other Defendants.

28

### III.    FACTUAL ALLEGATIONS

16.     EDD issues a variety of benefits to California residents, including but not limited to unemployment insurance benefits, disability insurance benefits, paid family leave benefits, pandemic unemployment assistance benefits, and pandemic emergency unemployment compensation benefits (collectively, "EDD benefits").

17.     In 2010, Defendant entered into an exclusive contract with California EDD to issue debit cards through which individuals entitled to EDD benefits could access their funds, replacing distribution of EDD benefits through paper checks.  EDD chose to contract with Bank of America, in part, because it promised the EDD "best-in-class" fraud monitoring.

18.     In July 2011, EDD began distributing benefits through the Bank of America cards as the default option for EDD benefits recipients.

19.     In 2015, Bank of America extended its exclusive contract with EDD, representing in its proposal that it "fully intend[s] to apply the most rigorous fraud detection procedures,"

20.     Under the contract, Bank of America retains exclusive control over account management and fraud detection for EDD cards and accounts.

21.     Bank of America has failed to store or transfer EDD cardholder and account information in a secure manner, resulting in a massive security breach that has resulted in millions of dollars stolen from EDD through fraud.

22.     For example, some EDD cardholders who have had money stolen from their EDD account through unauthorized transactions report never having used their EDD card.

23.     The massive fraud on EDD accounts strongly indicates a wide-scale security breach of EDD cardholder and account information in Bank of America's possession, custody, and control, and which Bank of America had a duty to secure.

24.     The personal data of EDD cardholders is stored on their card.  When the cardholder either swipes or inserts their card into a card reader, the reader obtains data from the card and transmits that data to the financial services provider through a computer network.

25.    For many years, magnetic stripes—which contain the cardholder's name, account number, and the card expiration date—were the standard for storing consumer information on debit and credit cards.    When swiped through a reader, this data is collected and transmitted as part of the transaction process.

26.    Magnetic stripe cards are highly susceptible to fraud because the data on them is static from transaction to transaction.    A common method of accessing information from magnetic stripe cards is called "skimming," a process by which a which a wireless transmitter affixed to a card reader collects the information on the magnetic stripe.    The recipient can then use the information to access the consumer's bank account and use the card for transaction.

27.    Data on magnetic stripe cards can be captured by hackers on a large scale.    This can occur, for instance, where a hacker infects a payment terminal with a computer virus which gathers all card data.    Card data collected in this manner can be sold on the dark web, where the stolen data can be used to make fraudulent purchases.

28.    In recent years, in response to the security risks associated with magnetic stripes, EMV chip technology has become standard in the banking industry.    EMV chips are "dynamic," meaning the chip creates a unique electronic signature for each transaction.    This makes data from past EMV chip card purchases irrelevant to future purchases, reducing the risk of fraudulent transactions.

29.    Bank of America has offered EMV chip corporate credit cards to a subset of U.S. business customers who regularly traveled outside the United States since 2011.    In 2014, Bank of America announced that it would include chip technology on "all new and reissued" consumer debit cards.    A Bank of America executive stated at the time that "chip technology is an important tool in increasing card security, and we want our customers to have the best possible experience when using their payment cards."    The executive added that the "new chip-enabled cards will improve security of customers' transactions."

30.    From 2014 to 2016, EMV chips were widely adopted across the banking industry. By 2017, an estimated 855 million EMV chip cards had been issued to U.S. consumers. Today such cards are standard in the industry.

31.    Bank of America states on its website that EMV chip technology "has been around for over 20 years and is the credit and debit card security standard in many countries around the world. When purchases are made using the chip feature at chip-enabled terminals, the transaction is more secure because of the process used to determine if the card is authentic. This makes the card more difficult to counterfeit or copy." Bank of America also assures its account holders on its website that "whether you use the magnetic stripe or the chip to make your purchase, you can have confidence in the protection and security features we provide for all credit and debit accounts."

32.    Even though Bank of America was well aware that EMV chip cards are significantly more secure than magnetic stripe cards, it chose to issue EDD debit cards using vulnerable stripe technology. The unsecure cards have facilitated the fraud on EDD cards.

33.    Under Bank of America's "Zero Liability" policy, it represents to EDD benefits recipients that they will not be responsible for unauthorized transactions.

34.    In its California Employment Development Department Debit Card Account Agreement ("Agreement"), to which all EDD cardholders must agree, Bank of America sets forth its "Zero Liability" policy:

- *"Under the Bank of America 'zero liability' policy, you may incur no liability for unauthorized use of your Card up to amount of the unauthorized transaction, provided you notify us within a reasonable time ['no later than 60 days' after Bank of America sends an EDD cardholder the statement on which the error appeared] . . . ."*

- *"[C]ontact us at the number listed below AT ONCE if you believe your Card has been lost or stolen or if you believe that someone may use of has used your PIN assigned to your card without your permission. Telephoning is the best way of keeping your possible losses down."*

- 6 -

*Mosson v. Bank of America, N.A.*

35. The Agreement promises that Bank of America "will determine whether an error occurred within 10 business days." Bank of America may take up to 45 days to determine whether an unauthorized transaction occurred on an EDD account only if it "credit[s] your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation."

36. Bank of America also represents to EDD cardholders that it offers round-the-clock customer service to assist EDD cardholders with suspected fraud. On its website, Bank of America's states, "[f]or your convenience" Bank of America's "dedicated customer service representatives are available 24 hours day [sic], 7 days a week" by phone. In the Agreement, Bank of America advises EDD cardholders that "Telephoning is the best way of keeping your possible losses down."

37. Recently, countless EDD cardholders have each reported hundreds and thousands of dollars stolen through unauthorized use of their Bank of America EDD debit cards.

38. Criminals have been able to take advantage of the security vulnerabilities of Bank of America's EDD cards and accounts and misappropriate account information. That information can then be sold on the dark web, allowing the buyer to engage in unauthorized use of EDD accounts.

39. In December, 2020, for instance, Mosson was confused when he saw on his statement a charge from the restaurant delivery service DoorDash, for a delivery in Ontario, Canada, and for an ATM withdrawal in a part of California that he had not visited.

40. Plaintiff did not receive a notification about these highly unusual transactions, indicating that Bank of America failed to detect the instances of fraud, even though Bank of America promised fraud monitoring.

41. Many EDD cardholders have also reported not receiving any notification or communication from Bank of America regarding fraudulent transactions in their accounts, instead discovering it themselves.

42. While Bank of America's inexplicable failure to notify Mosson of the fraud, Mosson did identify the fraudulent charges himself, and reported them to Bank of America. Bank of America said that they would send Mosson a new card. Mosson was able to continue to use his card for

1  approximately a week, but in mid-December, when attempting to make a purchase, his card was

2  declined, and he has been unable to use it since. The new card promised by Bank of America never

3  arrived. Mosson called Bank of America to inquire about the new card and as to why his current

4  card was not working, only to be told after a number of lengthy phone calls with Bank of America

5  customer service that his account had been frozen.

6      43.    The responsibility prevent fraud and address claims of unauthorized transactions lies

7  entirely with Bank of America. EDD has clarified that it "has no direct access to debit funds on any

8  accounts" and that those impacted by card issues should contact Bank of America.

9      44.    In October 2020, Bank of America froze an estimated 350,000 EDD accounts,

10  preventing those EDD cardholders from accessing their benefits.

11      45.    Many have reported finding unauthorized transactions on their cards and seeking

12  assistance from Bank of America to no avail. Despite Bank of America's purported "Zero Liability"

13  policy regarding fraudulent charges, Bank of America has been unhelpful and largely ineffective in

14  its response. EDD cardholders often spend hours on hold with customer service, despite Bank of

15  America having represented to EDD cardholders in the account Agreement that "[t]elephoning is

16  the best way of keeping your possible losses down." Defrauded EDD cardholders have had

17  difficulty filing claims. And even when claims are filed, it can take weeks before the claim's

18  investigation ever occurs.

19      46.    Bank of America's inadequate response to EDD cardholders' issues with fraud on

20  their EDD accounts shows it has failed to adequately staff its customer service and fraud

21  investigation departments.

22      47.    Bank of America's ineffective response to the rampant fraud has taken various forms,

23  including not answering the customer service phone lines it advises EDD debit cardholders to call;

24  opening claims and then closing them so soon thereafter that a full review could not have been done;

25  crediting funds and then later debiting them without notice to the EDD cardholder; failing to extend

26  provisional credit to EDD cardholders; and freezing EDD cardholder accounts unaffected by fraud.

27

28

48.    In short, as has been widely reported, many EDD cardholders have been forced to undertake an "unofficial full-time job trying to get the money back."

49.    A Bank of America customer service worker, addressing the company's response to the influx of EDD debit card fraud, reported: "We're actually no longer allowed to tell them a timeframe, because we have no clue . . . . Every day, I talk to 30 people with the same story. I just pray for them after my shift, honestly."

50.    After being told that his account had been frozen, Mosson called bank of America numerous times searching for answers as to how to get back into his account. Bank of America eventually pointed the finger at EDD, saying that Mosson needed to contact the California EDD department. EDD assured him that the issue was with Bank of America. After many frustrating phone calls with Bank of America, almost two months later Mosson is still locked out of his Bank of America accounts.

51.    Eventually, frustrated with the lack of responsiveness from Bank of America's customer service department, Mosson was forced to go into a Bank of America branch to attempt to regain access to his account. There, after presenting multiple forms of ID, he was informed that Bank of America was unable to check his account balance. Seeking to finally access his funds, Mosson stated that he would like to withdraw his entire balance. When the tellers attempted to do so, they informed him that his account was empty, and the funds had been returned to the State of California. Mosson estimates that more than $6,000.00 should have been in the account at the time he attempted to make the withdrawal.

52.    In late November 2020, California lawmakers wrote a letter to Bank of America Chairman and CEO Brian Moynihan concerning the rampant fraud involving EDD cards and accounts, and the company's inadequate response.  The letter notes, "The only recourse that EDD and our offices can currently provide constituents is to call Bank of America when these problems occur.  However, constituents report they are unable to get through to your call centers, or when they do, the issue is not resolved."  The letter adds, "Many of our own staff have also tried to reach Bank of America to no avail."

53.     In response to the letter, Bank of America stated that fraud is "not something that happens for most [EDD debit] cards." The company responded that "[w]hen a legitimate cardholder reports that he or she has had fraud on his or her account (such as unauthorized use) and Bank of America's investigation confirms the report, Bank of America covers the losses to the cardholder consistent with federal law and pursuant to our 'Zero Liability' policy for unauthorized transactions."

## IV.   CLASS ALLEGATIONS

54.     Plaintiff brings this class action lawsuit individually and as a class action pursuant to Federal Rule of Civil Procedure ("Rule") 23, seeking declaratory and equitable relief on behalf of the two following subclasses (collectively, the "Class"):

> All individuals who have maintained a Bank of America prepaid debit card for the purpose of accessing EDD benefits during the Class Period, and were harmed as set forth herein.

55.     Excluded from the above-proposed Class is Defendant's officers and directors and any entity in which any Defendant has a controlling interest.

56.     Plaintiff reserves the right under Rule 23 to amend or modify the class descriptions with greater specificity or further division into subclasses or limitation to particular issues, based on information learned after the filing of this Complaint.

57.     This action has been brought and may properly be maintained as a class action against Bank of America pursuant to the provisions of Rule 23.

58.     **Numerosity (Rule 23(a)(1))**: The members of the Class are so numerous that their individual joinder is impracticable. Hundreds of thousands people, or more, received EDD debit card with magnetic stripes issued by Bank of America during the Class Period, or who otherwise meet would be members of the putative Class as defined above. Insofar as class members may be identified through business records regularly maintained by Bank of America or Bank of America's employees, agents, principles, joint venturers, partners, affiliates, parents, or subsidiaries, and through the media, the number and identities of putative Class members can be ascertained.

1  Members of the putative Class can be notified of the pending action by e-mail, U.S. mail, and

2  supplemented by published notice, if necessary.

3      59.    **Commonality (Rule 23(a)(2) and 23(b)(3))**: There are questions of law and fact

4  common to the Class. These questions predominate over any questions affecting only individual

5  class members. These common legal and factual issues include, but are not limited to:

6          (a)    Whether Defendant engaged in conduct that constitutes *per se* violations of

7  state and federal laws with respect to the distribution of EDD benefits through Bank of America

8  debit cards, or with respect to any other performance under its contract with EDD;

9          (b)    Whether Defendant breached its duty of care;

10         (c)    Whether Defendant should be enjoined from freezing accounts of EDD

11  accountholders;

12         (d)    Whether Defendant's conduct breached any express or implied contract with

13  EDD or any state agency, with the recipients of EDD debit cards, or with any member of the putative

14  Class;

15         (e)    Whether Defendant must provide damages, restitution, reimbursement,

16  and/or other relief to EDD cardholders in the amount of any fraudulent or unauthorized transactions

17  affecting their EDD debit cards, and/or whether Defendant must provide any such relief for

18  foreseeable harm to the EDD cardholders resulting from Bank of America's unlawful conduct.

19     60.    **Typicality (Rule 23(a)(3))**: Plaintiff's claims are typical of the claims of the

20  members of the putative Class. Plaintiff, like all other members of the putative Class, has sustained

21  damages arising from Defendant's violations of the law, as alleged herein.  The representative

22  Plaintiff and the members of the putative Class were and are similarly or identically harmed by the

23  same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by

24  Defendant.

25     61.    Adequacy of Representation (Rule 23(a)(4)): The representative Plaintiff will fairly

26  and adequately represent and protect the interests of the putative Class members, and she has

27  retained counsel who are experienced and competent trial lawyers in complex litigation and class

28

action litigation. There are no material conflicts between the claims of the representative Plaintiff and the members of the putative Class that would make class certification inappropriate. Counsel for the putative Class will vigorously assert the claims of all putative Class members.

62.    Class Action Status (Rule 23(b)(1)): Class action status is warranted here under Rule 23(b)(1)(A) because prosecution of separate actions by putative Class members would create a risk of establishing incompatible standards of conduct for Defendant.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by putative Class members would create a risk of adjudication with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

63.    Declaratory and Injunctive Relief (Rule 23(b)(2)): Certification under Rule 23(b)(2) is warranted because Defendant acted or refused to act on grounds generally applicable to the putative Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the putative Class as a whole.

64.    Superiority (Rule 23(b)(3)): Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to putative Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

65.    The Class is ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class member were infringed or violated in the same or similar fashion.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violations of California's Unfair Competition Law

66.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

*Mosson v. Bank of America, N.A.*

67.    California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof Code § 17200, *et seq.*

68.    Bank of America's "unfair" acts and business practices include, among other things: (a) failing to transfer or store EDD cardholder and account information in a secure manner; (b) representing to the State of California that its EDD debit cards and card services would entail "best-in-class" fraud monitoring, and then failing to equip its EDD debit cards with EMV microchip technology despite knowing that such technology would be a necessary component of "best-in-class" fraud monitoring; (c) failing to provide reasonable or adequate telephone assistance to Plaintiff and other Class members despite representing to them that such assistance is available "24/7" and despite representing to them that "Telephoning is the best way of keeping your possible losses down"; (d) failing to investigate and resolve Plaintiff's and Class members' claims of unauthorized transactions in a timely manner despite its "Zero Liability" policy for unauthorized transactions; and (e) failing to extend provisional credit to Plaintiff and class Members in cases where it is unable to timely investigate and resolve fraud claims.

69.    Bank of America's acts, omissions, and conduct are "unfair" under the UCL because those acts, omissions, and conduct, as alleged herein, offend public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and Class members.  The harm caused by Bank of America's conduct outweighs any potential benefits attributable to such conduct, and there were reasonably available alternatives to further Defendant's legitimate business interests—namely issuing EDD debit cards with EMV microchips and maintaining procedures and resources adequate to timely resolve reports of fraudulent activity on prepaid EDD accounts—other than Bank of America's conduct described herein.

70.    Bank of America has engaged in "unlawful" acts and business practices by violating multiple laws, including the California Consumer Privacy Act, as alleged herein; Regulation E of the federal Electronic Funds Transfer Act ("Regulation E"), which requires Bank of America to limit EDD cardholders' liability for unauthorized transactions and to extend provisional credit to

EDD cardholders in cases where a fraud claim is not resolved within ten business days; and California statutory and common law, as alleged herein.

71.     As alleged herein, Bank of America expressly represented to Plaintiff and Class members, among other things, that EDD cardholders would have "Zero Liability" for unauthorized transactions, and that customer service representatives would be available 24 hours a day, 7 days a week, to address Plaintiff's and Class members' issues regarding unauthorized transactions.

72.     Bank of America has engaged in "fraudulent" acts and business practices because its false representations to EDD cardholders that they would have "Zero Liability" for unauthorized transactions and that customer service representatives would be available 24 hours a day, 7 days a week were likely to deceive, and did deceive, Plaintiff and Class members into using Bank of America's EDD debit card services to receive EDD benefits (instead of, for example, opting to receive EDD benefits via paper check) and into using Bank of America's EDD debit card services with substantially less vigilance than they otherwise would have, had they known about Defendant's fraudulent acts and business practices and false representations, as alleged herein.

73.     As a result of Bank of America's violations of the UCL, Plaintiff and Class members are entitled to injunctive relief (a) prohibiting Bank of America from continuing its unfair, unlawful, and deceptive business practices, and (b) requiring Bank of America to take reasonable measures to prevent future unauthorized use of EDD debit cards and accounts and to ensure timely and adequate processing of EDD cardholders' claims regarding unauthorized or fraudulent use of their EDD debit cards or accounts.

74.     As a result of Bank of America's violations of the UCL, Plaintiff and Class members have suffered injury in fact and lost money or property, including but not limited to the funds lost to fraud that have not been reimbursed, fees paid to Bank of America, and lost interest that would have accrued on funds during the period of time when the funds were unavailable due to Bank of America's failure to timely and adequately investigate claims of unauthorized transactions and other violations of the UCL.

75.

## SECOND CAUSE OF ACTION

### Violation of the California Consumer Privacy Act

1. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

2. The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100, *et seq.*, provides consumers with a private right of action against businesses when their personal information is subject to unauthorized access, theft, or disclosure as a result of a business's breach of its duty to take reasonable steps to protect that information.

3. Plaintiff and Class members are "consumers" as defined in the CCPA.

4. Defendant Bank of America is a "business" as that term is defined in the CCPA and therefore is subject to liability to thereunder.

5. Bank of America directly or indirectly collected Plaintiff's and Class members' personal information as defined in Cal. Civ. Code § 1798.81.5(d)(1)(A), including but not limited to Plaintiff's and Class member's first names or first initials, last names and account numbers or credit or debit card numbers, in combination with any required security codes, access codes, or passwords that would permit access to an individual's financial accounts.

6. Plaintiff's and Class members' individual and collective personal information was collected, stored, and/or transmitted by Bank of America in a nonencrypted and nonredacted form, or in some other form that permitted unauthorized individuals to access that information in violation of the CCPA.

7. As a business, Bank of America had a duty under CCPA to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff and Class members' personal information.

8. Bank of America breached its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff's and Class members' personal information by, among other things, issuing EDD debit cards to Plaintiff and Class members with magnetic stripes but without EMV chip technology.

9.    Upon information and belief, Bank of America further failed to implement and maintain reasonable security measures by transferring information regarding Plaintiff and Class members' EDD debit card to, and storing it on, unsecured or inadequately secured data storage devices, including at EDD.

10.    As a direct and proximate result of Bank of America's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff and Class members' personal information, Plaintiff and Class members suffered unauthorized access and exfiltration, theft, or disclosure of their nonencrypted and nonredacted personal information. Plaintiff and Class members never authorized such disclosure of their personal information.

11.    Bank of America knew or should have known that issuing EDD debit cards with magnetic stripes but without EMV chip technology was not a reasonable security procedure or practice appropriate to the nature of Plaintiff and Class members' personal information and that a data breach resulting in the unauthorized access and exfiltration, theft, or disclosure of Plaintiff and Class members' personal information was highly foreseeable.

12.    As a direct and proximate result of the unauthorized access and exfiltration, theft, or disclosure of their nonencrypted and nonredacted personal information, Plaintiff and Class members were injured and lost and/or continue to lose money or property, including but not limited to the monetary value of unauthorized transactions on the EDD debit cards issued by Defendant, the loss of Plaintiff and Class members' protected privacy interests in the confidentiality and privacy of their personal information, nominal damages, and additional losses as described above.

13.    Plaintiff and Class members seek relief under Cal. Civ. Code § 1798.150(a), including but not limited to recovery of actual damages, statutory damages, injunctive relief, declaratory relief, its costs of suit, attorney's fees pursuant to Cal. Code Civ. Proc. § 1021.5 or other appliable law, and any other relief the court deems proper.

## **THIRD CAUSE OF ACTION**

### **Violations of The Electronic Funds Transfer Act**

(15 U.S.C. § 1693, *et seq.*; 12 C.F.R. § 1005.1 *et seq.*)

*Mosson v. Bank of America, N.A.*

14. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

15. Plaintiff brings this cause of action pursuant to the United States Electronic Funds Transfer Act ("EFTA") and 12 C.F.R. §§ 1005.1–1005.20 (Regulation E of the EFTA).

16. Plaintiff and Class members provided notice to Bank of America within 60 days after Bank of America sent a period statement reflecting an unauthorized transaction (which is an "error" under Regulation E), thereby triggering the error resolution requirements of 12 C.F.R. § 1005.11.

17. Bank of America violated Regulation E, 12 C.F.R. § 1005.11, because it failed to provide provisional credit to Plaintiff and Class members accounts relating to error investigations that could not be resolved within 10 business days.

18. In situations where Bank of America has violated Regulation E by failing to provisionally credit Plaintiff's and Class members' accounts, Bank of America has failed to conduct good faith investigations into the unauthorized transactions that Plaintiff and Class members have reported or attempted to report by, among other things, failing to provide Plaintiff and Class members reasonable access to Bank of America's customer service, and failing to provide Plaintiff and Class members meaningful assistance when they have been able to reach customer service. Plaintiff and Class members are therefore entitled to treble damages under 15 U.S.C. § 1693f(e).

19. In situations where Bank of America has violated Regulation E by failing to provisionally recredit Plaintiff's and Class members' accounts, Bank of America has not had a reasonable basis for believing that the account was not in error. Instead, Bank of America: (a) has made it unreasonably difficult for EDD cardholders to report suspected unauthorized transactions, and (b) has not used at all relevant times, and is not currently using, the resources and procedures necessary to resolve the levels of fraud that are occurring on Plaintiff's and Class members' accounts. This demonstrates that Bank of America has been unable or unwilling to form a reasonable basis for believing an account was not in error. Plaintiff and Class members are therefore entitled to treble damages under 15 U.S.C. § 1693f(e).

20.    Bank of America knowingly and willfully concluded that Plaintiff's and Class members' accounts were not in error when such conclusion could not reasonably have been drawn from the evidence available to Bank of America at the time of its investigation.  Plaintiff and Class members are therefore entitled to treble damages under 15 U.S.C. § 1693f(e).

21.    Bank of America violated Regulation E by failing to limit Plaintiff's and Class members' liability as required by 12 C.F.R. § 1005.6(b).

22.    Plaintiff provided notice to Bank of America less than two business days after learning of the fraudulent transactions that occurred in her EDD Bank of America account.  Under 12 C.F.R. § 1005.6(b)(1), Plaintiff's and similarly-situated Class members' liability is capped at $50 in these circumstances.  Despite this cap on liability, Bank of America has subjected Plaintiff and similarly-situated Class members' to over $50 in liability.

23.    Under 12 C.F.R. § 1005.6(b)(2), $500 is the maximum liability when an accountholder does not provide notice to the financial institution within two business days after learning of a suspected unauthorized transaction.

24.    Regarding any Class members who did not provide Bank of America with actual notice within two business days of learning of a suspected unauthorized transaction, Bank of America was on constructive notice, under 12 C.F.R. § 1005.6(b)(5)(iii), of widespread unauthorized electronic funds transfers from EDD debit card accounts since the beginning of the Covid-19 pandemic.  Since that time, countless unauthorized fund transfers have occurred and continue to occur from EDD accounts.  The volume of calls from EDD cardholders to Bank of America's customer service to report unauthorized transactions has been, and continues to be, so great that EDD cardholders routinely wait on hold for multiple hours.  The widespread fraud specifically targeting EDD cardholders has been widely reported in the media and has been the subject of significant attention from California legislators.

25.    In no event should any class member be liable for over $500 of damages under 12 C.F.R. § 1005.6.  Bank of America has violated 12 C.F.R. § 1005.6 by imposing hundreds and thousands of dollars of liability on unemployed Californians.

*Mosson v. Bank of America, N.A.*

26.    As a direct and proximate result of Bank of America violating Regulation E, Plaintiff and Class members have lost money.

27.    Plaintiff, on behalf of herself and the Class, seek the following relief: (a) actual damages; (b) restitution of all EDD benefits funds improperly debited by Bank of America; (c) statutory damages; (d) treble damages pursuant to 15 U.S.C. § 1693f(e); (e) incidental and consequential damages suffered due to their inability to pay bills or otherwise use their unemployment funds; and (f) an injunction barring Bank of America from illegally debiting EDD benefits.

## FOURTH CAUSE OF ACTION

### Negligence

28.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

29.    Bank of America owed a duty to Plaintiff and the other Class members to exercise reasonable care to (a) safeguard their unemployment and other EDD benefits; (b) respond to the rise in use of unemployment and other EDD benefits that occurred in 2020 (both in terms of the amount of benefits paid out and the number of recipients) by issuing them EDD debit cards with EMV chips (to all new and existing EDD cardholders); (c) ensure that its customer service staffing levels, technology, and operations were capable of providing them with reasonably timely and effective customer service, including for fraudulent or unauthorized transactions related to their EDD debit cards or accounts; (d) provide them with reasonable and adequate notice that their EDD debit cards and accounts were at risk of being subject to unauthorized use; (e) timely and adequately investigate and resolve their claims regarding unauthorized or fraudulent transactions; and (f) extend to them provisional credit in cases where Bank of America fails to timely resolve their fraud-related claims.

30.    Bank of America breached its duty to Plaintiff and Class members by, among other things: (a) failing to transfer or store their EDD cardholder and account information in a secure manner; (b) failing to issue them EDD debit cards with EMV chips, despite having for years been well-aware of the risks associated with magnetic "stripe" technology; (c) failing to respond to the

dramatic increase in EDD benefits recipients and dollars (which foreseeably would make EDD debit cards and accounts of greater interest to bad actors) by issuing EDD debit cards with EMV chips to all new and existing EDD cardholders, and taking other reasonably prudent security measures to prevent fraudulent and unauthorized transactions; (d) failing to ensure its customer service operation was capable of providing reasonably timely and effective assistance to Plaintiff and Class members, including when they are victims of fraudulent or unauthorized transactions; (e) failing to give reasonable and adequate notice to Plaintiff and Class members that their EDD benefits were and remain at risk of being vulnerable to fraudulent and unauthorized transactions; (f) failing process EDD cardholders' claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner; and (g) failing to extend provisional credit to Plaintiff and Class members when Bank of America fails to resolve their claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner.

31.     Bank of America's misconduct concerning its failure to safeguard EDD cardholders' funds is inconsistent with industry standards, which prescribe using EMV chip technology in debit cards.

32.     Bank of America's misconduct concerning its failure to timely and adequately respond to Plaintiff's and Class members' claims of fraudulent and unauthorized transactions on their EDD debit cards or accounts is inconsistent with industry regulations, including Regulation E.

33.     Bank of America's misconduct is inconsistent with its own policies and procedures for non-EDD debit card accounts, for which Bank of America consistently deploys EMV chip technology to prevent fraud.

34.     The harm inflicted upon Plaintiff and other Class members was reasonably foreseeable to Bank of America because it was and is well aware of the security risks associated with magnetic stripe technology, and because it knew or should have known its customer service resources and/or procedures were insufficient to accommodate issues stemming from the significant increase in EDD benefits and EDD benefits recipients due to the sharp rise in unemployment in the State of California caused by or related to the Covid-19 pandemic, as well as the well-publicized

*Mosson v. Bank of America, N.A.*

1  sharp rise in financial fraud during the Covid-19 pandemic, both of which would foreseeably lead
2  to an increased demand for customer service by Plaintiff and Class members for all purposes,
3  including for the purpose of reporting and attempting to resolve claims of fraudulent or unauthorized
4  transactions.

5      35.    As a direct and proximate result of Bank of America's misconduct, Plaintiff and
6  Class members have been deprived of their EDD benefits and have failed to receive accrued interest
7  thereon.

## FIFTH CAUSE OF ACTION

### Breach of Contract

10      36.    Plaintiff repeats and incorporates by reference each and every allegation set forth
11  above, as though fully set forth here.

12      37.    Plaintiff and Class members entered into a contract requiring Bank of America to
13  administer EDD benefits to them through prepaid debit cards.

14      38.    The contract provides in Section 9:

15  Federal law (described in the section below entitled "Regulation E Liability
   Disclosure; Your Liability in Case of Loss, Theft or Unauthorized Transactions") may
16  limit your liability for unauthorized transactions in some circumstances. Under the
   Bank of America "zero liability" policy, you may incur no liability for unauthorized
17  use of your Card up to the amount of the transaction, provided you notify us within a
   reasonable time of the loss or theft of your Card, Card number or PIN or its
18  unauthorized use, subject to the following terms and conditions . . . .

19      39.    The contract provides in Section 11:
20

21  We will determine whether an error occurred within 10 business days after we hear
   from you—and will correct any error promptly. If we need more time, however, we
22  may take up to 45 days to investigate your complaint or question. If we decide to do
   this, we will credit your Account within 10 business days for the amount you think is
23  in error, so that you will have the money during the time it takes us to complete our
   investigation.
24

25      40.    Plaintiff and Class members did all, or substantially all, of the significant things that
26  the contract required and fulfilled any conditions precedent to Bank of America's performance,
27  including, among other things, contacting or attempting to contact Bank of America to reimburse
28  fraudulently appropriated funds within the time specified in the account agreement.

41.     Bank of America failed to perform as promised in the contract by, among other things: (a) failing to timely investigate and resolve claims of unauthorized card use, as required by Section 11 of the account agreement; (b) failing to reimburse Plaintiff and Class members for unauthorized card use or provide provisional credit within ten business days, as required by Section 11 of the account agreement; and (c) failing to limit EDD cardholders' liability as required by Section 9 of the account agreement.

42.     Plaintiff and Class members were harmed by Bank of America's conduct and have suffered actual damages in an amount equal to the difference in the value of the banking services they provided valuable consideration for and the banking services they received.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following relief:

A.     For an order certifying the Class as defined above, appointing Plaintiff as representative for the Class, and appointing Plaintiff's counsel as counsel for the Class;

B.     For declaratory and injunctive relief prohibiting Defendant from engaging in the misconduct described herein, including but not limited to ordering that Defendant take each of the following corrective actions:

(1)     Refund all Class members for the value of unauthorized transactions from their EDD accounts;

(2)     Issue EDD debit cards with EMV chips to all current and future EDD cardholders;

(3)     Establish a customer service website, e-mail address, and telephone hotline that allow EDD cardholders to report unauthorized transactions and request reimbursement of the same in a reasonably easy and hassle-free manner;

(4)     Respond to EDD cardholders' claims of unauthorized transactions and requests for reimbursement within a reasonable time; and

(5)    Provide a reasonable opportunity for Class members to file claims regarding unauthorized transactions that otherwise would be deemed expired;

C.    For an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class members, including disgorgement, unjust enrichment, restitution, and all other available relief under applicable law, including but not limited to accrued interest for the periods during which Plaintiff and Class members were deprived of funds in their EDD accounts due to unauthorized transactions;

D.    For an award of punitive damages pursuant to applicable law;

E.    For reasonable attorneys' fees and expenses as permitted by California Code of Civil Procedure § 1021.5, 15 U.S.C. § 1693m(a)(3), and any other applicable statute or law;

F.    For taxable costs;

G.    For pre- and post-judgment interest as allowed by law; and

H.    For any other relief the Court deems just.

## JURY DEMAND

Plaintiff requests trial by jury.

Dated: January 28, 2021                By: _____
                                            P. TERRY ANDERLINI
                                            JOSEPH M. GOETHALS
                                            JACKSON D. MORGUS
                                            Attorneys for Plaintiff